# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

Melissa A. Kane,                                  :        Case No. 1:10CV1874

      Plaintiff,                              :

v.                                                :

Commissioner of Social Security,                  :        **MAGISTRATE'S REPORT AND**
                                        **RECOMMENDATION**
      Defendant.                              :

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 13, 16 and 17).  For the reasons that follow, the Magistrate recommends that the Court remand this case to the Commissioner, pursuant to sentence four of 42 U. S. C. § 405(g), for further hearing consistent with this Report and Recommendation..

## I. PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on February 1, 2005, alleging that her disability began on January 2, 2003 (Tr. 95-97, 317-318).  Plaintiff's requests were denied initially and upon reconsideration (Tr. 75-76, 81-83, 84-86, 320-322).  Plaintiff, represented by counsel, and Vocational Expert (VE) James Breen appeared and testified at an administrative hearing before Administrative Law

Judge (ALJ) John Mondi (Tr. 323). The ALJ rendered an unfavorable decision and the Appeals

Council denied Plaintiff's request for review of that decision(Tr. 4-6; 29-39).

## II. FACTUAL BACKGROUND

### A.    PLAINTIFF'S TESTIMONY.

Plaintiff was 26 years old, single and lived with her mother  She was 5'9" tall and weighed 292

pounds  Plaintiff had overcome learning disabilities to graduate from high school (Tr. 326-327, 336).

Plaintiff had previously been granted a period of disability based upon epilepsy which she had

experienced since age 16. Currently, Plaintiff's impairments which interfered with her ability to work,

in addition to epilepsy, include: manic depression disorder, an obsessive compulsive disorder, carpal

tunnel syndrome, gastrointestinal difficulties and bipolar disorder (Tr. 327, 330). Plaintiff had one

seizure annually and the seizures affected her ability to remember (Tr. 331-332). The carpal tunnel

syndrome caused significant pain and numbness in her hands and fingers (Tr. 333, 334, 335).

During the past ten years, Plaintiff had worked at several gas stations, a fast food restaurant, a

motel and as an employee for a temporary agency (Tr. 330). Employed at Sears from March 2005 to

September 2007, Plaintiff was a part-time employee serving customers in the shoe department. She

earned approximately $300 biweekly. She quit because of a personality conflict with a manager (Tr.

329). In December 2007, Plaintiff was employed as a gas station attendant (Tr. 327). As a part-time

cashier, Plaintiff used her hands to manipulate cash register keys. Additional duties included stocking

items in the coolers that weighed, at most, twenty to thirty pounds, cleaning and monitoring the coffee

station (Tr. 328, 334-335, 336). Her net income was approximately $400 biweekly (Tr. 328). She

testified that she was prevented from working a greater number of hours because more lifting would

be required and would cause increased wrist pain.

2

Plaintiff was able to drive.  She also helped her mother with "little physical everyday things." Her mother managed her financial affairs.  Plaintiff did not visit friends much, instead, choosing to spend time at home with her dog and reading (Tr. 332, 333).

**B.**     **VE'S TESTIMONY.**

The ALJ posed a hypothetical worker with these limitations:  a younger person with a high school education and some learning disabilities, limited to light and sedentary work with limitations against sustained, repetitive use of the hands, and moderate limitations in her abilities to maintain concentration and attention for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and work week without interruption and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public and respond appropriately to changes in the work setting (Tr. 339-340).  It was the VE's opinion that this hypothetical worker could not return to any of Plaintiff's past relevant work.

Based upon census data for the second quarter 2007, the Bureau of Labor Market Information and Ohio Department of Job and Family Services statistics, the VE opined that the hypothetical worker could perform three unskilled occupations in the Cleveland and surrounding areas:  hand packager, electrical accessories assembler and housekeeper.  There were 8,000, 2,500 and 5,000, respectively, such positions that would fall within the limits of the hypothetical question (Tr. 340-341, 347).  The jobs of hand packager and electrical assembler would require training that was beyond a short demonstration of up to thirty days.  The training for the hand packaging job required a short demonstration (Tr. 346).

A hypothetical worker would be considered unemployable if he or she had marked limitations

in maintaining social functioning and extreme limitations in the ability to carry out detailed instructions, complete a normal work week and also set realistic goals (Tr. 341).  Similarly, if the VE were to fully credit all of Plaintiff's testimony, the hypothetical worker would be unable to perform competitive work on a forty hour work week.  The repetitive motion of the hand would interfere with the frequency with which he or she could perform.  The ability to stand and sit would be compromised and his or her mental condition would be inconsistent with completing a forty hour work week (Tr. 341).

### III.  SUMMARY OF MEDICAL EVIDENCE

The medical records show that Plaintiff underwent treatment by three physicians whose treatment overlapped:  Dr. Abraham Pedro, M. D., a family practitioner, Dr. Byong J. Ahn, M.D., a psychiatrist, and Dr. Said N. Abou-Haidar, M. D., a psychiatrist.  Dr. Catherine A. Flynn, Psy. D., a state agency psychologist, reviewed the record and completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment Forms.

### A.  DR. PEDRO.

Dr. Pedro treated Plaintiff from January 16, 2001 through October 10, 2007 (Tr. 209-234; 311-316).  On January 16, 2001, Dr. Pedro diagnosed Plaintiff with obesity, acute bronchitis and esophageal reflux.  He referred Plaintiff to a treatment center that addresses the causes, prevention and treatment of obesity (Tr. 234).  Plaintiff was treated for an upper respiratory infection and acute inflammation of the throat on February 21, 2001 (Tr. 233).  On March 30, 2001, Dr. Pedro noted the presence of a left leg ulcer with cellulitis (Tr. 231).  Dr. Pedro treated Plaintiff for another bout of acute bronchitis on June 19, 2001.  He noted, too, that Plaintiff was developing osteoarthritis of the knee from obesity (Tr. 230).  On December 23, 2001, Dr. Pedro explained that the ultrasound completed on August 16, 2001, showed evidence of gallstones.  The recurring abdominal pain was attributed to the gallstones (Tr. 228).

Dr. Pedro treated Plaintiff for a possible migraine type headache on April 16 and May 14, 2002 (Tr. 226, 227).  Eye drops were prescribed on May 20, 2002, to treat an eyelid stye (Tr. 225).  Plaintiff developed an inflamed throat and upper respiratory infection for which Dr. Pedro prescribed an antibiotic on June 17, 2002 (Tr. 224).  In August 2002, Dr. Pedro addressed an issue of allergic dermatitis and the presence of a skin rash with samples of an anti-allergy medication (Tr. 223).

Dr. Pedro treated Plaintiff for acute gastroenteritis, fatigue and malaise on April 29, 2003 (Tr. 222).  On May 15, 2003, Plaintiff presented with symptoms of acute sinusitis, acute bronchitis, obesity, tobacco use disorder, fatigue and malaise (Tr. 221).  There was no evidence of chest disease revealed from chest X-rays taken on June 13, 2003 (Tr. 287).  Dr. Pedro "pared down" some plantar warts on Plaintiff's right foot on August 12, 2003 (Tr. 220).

On September 18, 2003, Dr. Pedro changed Plaintiff's medication for depression as it was making her agitated (Tr. 219).  Plaintiff was treated for an upper respiratory infection and acute bronchitis on October 6, 2003.  She fractured her finger so Dr. Pedro applied a finger splint recommended an ice application (Tr. 218).

On February 18, 2004, Plaintiff fell down the stairs and injured her back.  On February 19, 2004, Dr. Pedro provided a pain reliever and recommended an ice application alternated with moist heat.  In addition, he referred Plaintiff for psychotherapy (Tr. 217).  On March 26, 2004, Dr. Pedro noted the presence of a bipolar disorder for which he recommended continued psychotherapy (Tr. 216).  Dr. Pedro prescribed Zithromax and an anti-allergy medication to treat allergic rhinitis, probable reactive airway disease and bronchitis on June 21, 2004 (Tr. 215).  On September 16, 2004, Dr. Pedro prescribed Midrin®, a medication designed to relieve migraine headaches, to be taken at the onset of a headache (Tr. 214).

On January 16, 2005, Plaintiff presented to EMH Healthcare for treatment of injuries sustained

in a motor vehicle accident (Tr. 198).  There was no evidence of fracture, dislocation or abnormality to Plaintiff's right wrist (Tr. 207).  During the follow-up visit with Dr. Pedro on January 18, 2005, Plaintiff was diagnosed and treated for persistent headache, acute neck strain and acute low back strain (Tr. 209).  The six views of the Plaintiff's lumbar spine showed no abnormality (Tr. 268).

In February 2005, Dr. Pedro ordered an electromyographic study.  The results showed moderate median nerve compression neuropathy at the wrist consistent with a diagnosis of carpal tunnel syndrome in the right wrist and mild and early changes in the median nerve compression neuropathy consistent with a diagnosis of carpal tunnel syndrome in the left wrist (Tr. 262).  The headaches persisted so Dr. Pedro referred Plaintiff to another physician to manage them in August 2005 (Tr. 316).

Plaintiff considered bariatric surgery.  On April 5, 2006, Dr. Pedro suggested that Plaintiff undergo a complete blood work including a thyroid function test, a comprehensive metabolic panel and a psychological evaluation prior to surgery.  Alternately, Dr. Pedro resolved to reduce Plaintiff's weight through a dietary regimen and aerobic exercise.  He referred Plaintiff to Dr. Haider for management of depression and anxiety (Tr. 313).

In October 2007, Dr. Pedro discussed the diet, prescribed an anti-smoking drug, started Plaintiff on medication to treat a dental abscess and addressed adequate blood pressure control (Tr. 312).

**B.      DR. AHN.**

Dr. Ahn conducted a review of symptoms after Plaintiff had taken an antidepressant for more than one year (Tr. 236).  On January 28, 2005, Dr. Ahn noted the presence of an obsessive compulsive disorder, an adult attention deficit hyperactivity disorder and the presence of serious symptoms or a serious impairment in social, occupational, or school functioning.  New medication was prescribed (Tr. 237).  Two weeks later, Plaintiff reported to Dr. Ahn that her mood swings were not as pronounced, her anger and frustration were improved a little bit and she was less agitated (Tr. 238).  On May 2, 2005,

6

Plaintiff was "doing all right" (Tr. 298).  However, on July 25, 2005, Plaintiff reported that she had

nightmares, lost her temper easily, generally felt irritable and was quick to anger.  Dr. Ahn increased

the dosage of medication prescribed generally to treat certain types of seizures (Tr. 297).

In August 2005, Dr. Ahn noted that Plaintiff, either intermittently or persistently, suffered some

or all of the following symptoms:  loss of interest, appetite disturbance, sleep disturbance, decreased

energy, thoughts of worthlessness, thoughts of suicide, hallucinations and paranoid thinking.  Plaintiff

had panic attacks and significant obsessive-compulsive symptoms.  The panic attacks did not result in

complete inability to function independently outside the area of Plaintiff's home.

Plaintiff's limitations caused a moderate restriction of activities of daily living and marked

difficulties in maintaining social functioning.  Also present were deficiencies in concentration

persistence and pace and repeated episodes of deterioration or decompensation in work or work-like

settings as well as an **extreme** impairment in Plaintiff's ability to set realistic goals or make plans

independently of others (Tr. 296).  As a result of her mental disorders, Plaintiff was **markedly** impaired

in the ability to:

1. Understand and remember detailed instructions, maintain attention and concentration for extended periods and perform within a schedule.
2. Maintain regular attendance and be punctual within customary tolerances.
3. Get along with coworkers or peers without distracting them or exhibiting behavioral extremes.
4. Travel in unfamiliar places or use public transportation.

(Tr. 294, 295, 296).

## C.     DR. FLYNN.

Dr. Flynn completed a psychiatric review on April 20, 2005, after which she determined that

Plaintiff had an obsessive compulsive disorder with anxiety, an adult attention deficit hyperactivity

disorder, a bipolar affective disorder and possible major depression (Tr. 240, 242, 244).  She further

indicated the degree to which the following limitations existed as a result of Plaintiff's mental disorders.

1.  Restriction on activities of daily living                              Mild
2.  Difficulties in maintaining social functioning                   Moderate
3.  Difficulties in maintaining concentration, persistence or pace   Moderate
4.  Episodes of decompensation each of extended duration             None

(Tr. 249).

Making summary conclusions from the evidence in the file, Dr. Flynn specified that Plaintiff had

moderate limitations in her mental abilities to:

1.  Maintain attention and concentration for extended periods of time.
2.  Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
3.  Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
4   Interact appropriately with the general public.
5.  Respond appropriately to changes in the work setting.

(Tr. 253, 254).

**D.      DR. HAIDAR.**

Dr. Haidar conducted psychotherapy sessions on April 12, April 26 and May 18, 2006 (Tr. 305-

309).  Initially, Plaintiff began a medication regimen to treat seizures; however, the side effects of the

medication exposure included skin eruptions (Tr. 308).  On April 26, 2006, Plaintiff's condition was

partially improved even though she was irritable, complained of difficulty sleeping, fatigue and

overeating.  The session was focused on giving Plaintiff an avenue to ventilate her feelings (Tr. 306).

Dr. Haidar provided emotional support for coping with depression and symptoms of obsessive

compulsive behaviors (Tr. 305).

### IV.  STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d

727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is

8

defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively. To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir.

2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS

The ALJ applied the governing five-step analyses in determining whether Plaintiff was disabled. At step one, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2007. Plaintiff was currently working part-time and had another part-time job after January 2, 2003, the alleged onset date of disability but the record does not establish disqualifying substantial gainful activity.

At step two, the ALJ found that Plaintiff had impairments that were at least in combination severe: a mental impairment and bilateral carpal tunnel syndromes.

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1525 and 404.1526). Plaintiff did have the residual functional capacity to perform light work although subject to limitations against more than occasional climbing of ladders/ropes/scaffolds; a need to avoid sustained, repetitive use of hands; and moderate limitations in the ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public and respond appropriately to changes in the work setting.

At step four, the ALJ found that Plaintiff was incapable of performing her past relevant work.

At step five, the ALJ found that Plaintiff, a younger individual age 18-49, with a high school

10

education and the ability to communicate in English, was capable of making a successful adjustment

to other work that exists in significant numbers in the national economy.  The ALJ concluded that

Plaintiff was not under a disability, as defined in the Act, at any time from January 2, 2003, through the

date of decision (Tr. 29-39).

## VI.  STANDARD OF REVIEW.

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d

830, 832 -833 (6th Cir. 2006).  When reviewing the Commissioner's determination of whether an

individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the

ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial

evidence*.*"  *Johnson v. Astrue,* 2010 WL 5559542, *3 (N. D. Ohio 2010) (*citing Blakley v.

Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009) (*citing Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997)).  The reviewing court will not "try the case de novo, nor resolve conflicts in

the evidence, nor decide questions of credibility.  *Id.* (*citing Walters*, *supra*, 127 F.3d at 528).

If the ALJ applied the correct legal standards and his or her findings are supported by substantial

evidence in the record, his or her decision is conclusive and must be affirmed.  *Id.* (*citing Warner v.

Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g)).  Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Rogers v.

Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *Richardson v. Perales*, 91 S. Ct.

1420, 1427 (1971) (*citing Consolidated Edison v. NLRB*, 59 S. Ct. 206, 217 (1938)).  The substantial

evidence standard is intended to create a "zone of choice within which the Commissioner can act,

without the fear of court interference."  *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)

11

(*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, it is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently.  *Id*. (*citing Crisp v. Secretary of Health & Human Services,* 790 F.2d 450, 453 n. 4 (6th Cir. 1986)).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner.  *Id.* (*see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) ("Although substantial evidence otherwise supports the decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff].");  *Id*. at 546 ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.' ") (*quoting* 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers*, 486 F.3d at 243 (holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion of the ALJ may be justified based upon the record").  "It is an elemental principal of administrative law that agencies are bound to follow their own regulations," *Id.* (*citing Wilson*, *supra*, 378 F.3d at 545, and the Court therefore "cannot excuse the denial of a mandatory procedural protection . . . simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination. *Id*. (*citing Wilson*, *supra*, 378 F. 3d at 546).  The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless. *Id*. (*see Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (finding that a party seeking to overturn an agency's administrative

decision normally bears the burden of showing that an error was harmful)).

An ALJ's violation of the Social Security Administration's (SSA) procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." *Id.* at *4 (*citing Wilson*, *supra*, 378 F.3d at 546-47 (emphasis added) (*quoting Connor v. United States Civil Services Commissioner*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  Thus, an ALJ's procedural error is harmless if his or her ultimate decision is supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard.  *Id.* (*see Wilson, supra*, 378 F. 3d at 547 (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an "important procedural safeguard" and therefore not a harmless error).  If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination.  *Id.* (*citing Blakley*, *supra*, 581 F.3d at 409) (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate decision, requires that a reviewing court "reverse and remand unless the error is a harmless de minimis procedural violation").

## VII.  PLAINTIFF'S POSITIONS.

(1)    The ALJ erred in evaluating Dr. Ahn's August 2005 opinions.
(2)    The ALJ erred in evaluating Plaintiff's residual functional capacity.
(3)    The ALJ's failed to properly evaluate whether Plaintiff can perform full-time work.
(4)    The ALJ made inconsistent findings regarding Plaintiff's insured status.

## VIII.  DEFENDANT'S POSITIONS.

(1)    Substantial evidence supports the ALJ's residual functional capacity finding and the weight given to the medical sources.

(2)    Substantial evidence supports the ALJ's finding that a significant number of jobs accommodated Plaintiff's functional capacity and vocational profile.

## IX. ANALYSIS.

A.    TREATING SOURCE.

Plaintiff argues primarily that the ALJ's opinion does not expressly acknowledge Dr. Ahn as a treating physician or attribute a measure of deference to his medical opinions.  Plaintiff emphasizes that Dr. Ahn's opinions support a claim for a more restrictive residual functional capacity which precludes her from doing other work.  It is Plaintiff's opinion that contrary to 20 C. F. R. § 404.1527(d)(2) and *Wilson, supra*, 378 F. 3d 541, the ALJ failed to evaluate Dr. Ahn's opinions of her work limitations related to her psychiatric state.  To the extent that the ALJ totally rejected Dr. Ahn's opinions, the rejection is unreviewable on appeal.

1.    THE TREATING PHYSICIAN RULE.

When assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards.  *Blakley, supra,* 581 F.3d at 406.  One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  *Id.* (*citing Wilson, supra*, 378 F.3d at 544) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record."  *Id.* (*citing Wilson*, 378 F.3d at 544 (*quoting* 20 C.F.R. § 404.1527(d)(2)).

Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion

of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." *Id.* (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)).  If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.  *Id.* (*citing Wilson*, 378 F.3d at 544; see also 20 C.F.R. § 404.1527(d)(2)).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion.  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* at 406-407 (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *5).  This procedural requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has indicated that he or she is disabled and then an administrative agency decision is rendered indicating that he or she is not disabled. *Id.* (*citing Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir. 1999)).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id.* (*citing Wilson*, 378 F.3d at 544).  Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," we have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given " denotes a lack of substantial evidence, even where the

conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers, supra*, 486 F.3d at 243 (emphasis added).

### 2.    SECTIONS 20 C. F. R. §§ 404.1527(d)(2), 416.927(d)(2).

The provisions of 20 C. F. R. § 404.1527 and 20 C. F. R. § 416.927 are mirror images of each other.  The relevant subcategories (d)(2) are as follows:

Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)    Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)    Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight
we give your treating source's opinion

### 3.    ANALYSIS OF THE ALJ'S DECISION.

The Magistrate is not persuaded that the treating physician rule was applicable to Dr. Ahn's opinions.  Dr. Ahn's record offered nothing by way of a detailed, longitudinal picture of Plaintiff's mental health impairments.  After the initial psychiatric evaluation on January 28, 2005, Dr. Ahn adopted the functional diagnoses made by other physicians (Tr. 236-237).  The totality of the

relationship between Plaintiff and Dr. Ahn consists of four visits during which Plaintiff reported her symptoms, Dr. Ahn adjusted the dosage of her medication according to the reported symptoms and Dr. Ahn dispensed samples when available (Tr. 238, 297, 298, 299).  Dr. Ahn's medical notes lack independent medical support by either clinical or laboratory diagnostic techniques.  In effect, Dr. Ahn's opinions offer nothing that would assist the ALJ in clarifying the nature and severity of Plaintiff's impairments.  The ALJ was not bound to give more weight to these opinions.

Neither was the ALJ required to reject Dr. Ahn's opinions related to Plaintiff's psychiatric state with a detailed analysis.  The ALJ complied with the requirements of 20 C. F. R. §§ 404.927(d)(3), 416.1527(d)(3), acknowledging that Dr. Ahn was a treating psychiatrist whose specialty was related to mental health impairments, that Dr. Ahn treated Plaintiff for a short period of time, that Dr. Ahn's opinions were not  supported by other evidence and that Dr. Ahn's opinions were not totally consistent with the state agency psychologists (Tr. 35, 36, 37).  The ALJ complied with the procedural rules in evaluating Dr. Ahn's opinions and the decision is supported by the evidence.  Therefore, the Court does not disturb the ALJ's decision to attribute little weight to Dr. Ahn's opinions.

**B.**  **MENTAL RFC.**

Plaintiff claims that the ALJ committed legal error by incorporating into the residual functional capacity finding the limitations from the Summary Conclusions, Section I  and not the limitations in the Functional Capacity Assessment, Section III.

**1**.  **THE ASSESSMENT FORM AND LAW**.

Because of the complexity of a mental disorder evaluation, a special Form SSA 4734-F4 SUP must be used to document mental residual functional capacity or what an individual can do despite his/her impairment.  http://policy.ssa.gov/poms.nsf/lnx/0424510060.  The SSA-4734-F4-SUP form is comprised of four sections:  (1) Heading, (2) Section I, Summary Conclusions, (3) Section II, Remarks,

17

and (4) Section III, Functional Capacity Assessment and Medical Consultant (MC) signature.  *Id.*  The heading provides space to record claimant and claim identification data.  *Id.*  Section I, a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation, is designed to record the MC's analysis of the evidence and his/her conclusions about the presence and degree of specific functional limitations, and the adequacy of documentation.  *Id.*  Section II provides for discussion of evidence needed to rate particular items in Section I.  *Id.*  Section III is for recording the mental residual functional capacity determination.  *Id.*  It is in this Section that the actual mental residual functional capacity assessment is recorded, explaining the conclusions indicated in Section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings.  *Id.*  The discussion of all mental capacities and limitations in this Section must be in narrative format.  *Id.*  The MC must also include any other information that he/she believes is necessary to present a complete picture of mental RFC.  *Id.*

The SSA's Program Operations Manual System (POMS), an operational reference used by SSA staff to conduct daily business, provides that Section DI 24510.064 regarding the completion of Section I states the box labeled "moderately limited" should be checked when the "evidence supports the conclusion that the individual's capacity to perform the activity is impaired.  *Velez v. Commissioner of Social Security,* 2010 WL 1487599, *6, fn 3 (N. D. Ohio 2010).  The degree and extent of the capacity or limitation must be described in narrative format in Section III.  *Id.*  Section III is the operative section for the ALJ's determination of a claimant's residual functional capacity.  *Black v. Commissioner of Social Security*, 2011 WL 711567, * (N. D. Ohio 2011).  "It is the narrative written by the psychiatrist or psychologist in section III ("Functional Capacity Assessment") of form SSA-4734-F4-SUP that adjudicators are to use as the assessment of [residual functional capacity]."  *Id. (citing* POMS, Section DI 25020.010).

2.     ANALYSIS OF PLAINTIFF'S CLAIMS.

The Magistrate finds that the ALJ's mental residual functional capacity finding does not reflect Dr. Flynn's narrative mental residual functional capacity assessment but rather Dr. Flynn's statements in Section I of the form.  The ALJ attempted to comply with the rules by making a declaration that the adopted the residual functional capacity findings of Dr. Flynn.  However, the rules require more. Adjudicators must take the residual functional capacity assessment in Section III and decide what significance the elements discussed in this residual functional capacity assessment has in terms of the claimant's ability to meet the mental demands of work.  The Magistrate cannot determine whether the ALJ included Dr. Flynn's functional limitations in assessing residual functional capacity and simply arrived at a different result.  For purposes of meaningful judicial review, the Commissioner must take the residual functional capacity assessment in Section III and examine it to ensure that all pertinent mental activities and the degree of limitation in sustaining these activities are adequately considered under the rules.  Without such review, the ALJ's residual functional capacity finding is not supported by substantial evidence.

C.     PART-TIME WORK.

Plaintiff takes the position that since the jobs posed by the VE did not distinguish between part-time and full time job classifications, her inability to perform full time work renders her disabled.  In other words, only if she can perform full time work can the ALJ find that she is not disabled.

Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  TITLES II AND XVI:  ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS  1996 WL 374184, *1 (July 2, 1996).  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  *Id.*  In assessing residual functional capacity, the adjudicator must discuss

the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and describe the maximum amount of each work related activity the individual can perform based on the evidence in the record.  *Id.*

Here, the ALJ was required to make a finding on the record related to the ability to the Plaintiff to perform in "an ordinary work setting."  The ALJ neither referred to SSR 96-8p nor conducted the analysis undertaken by SSR 96-8p.  The Magistrate recommends that on remand, the Commissioner also consider whether Plaintiff is able to perform sustained work activity on a regular and continuous basis consistent with SSR 96-8p.

**D.**     **DATE LAST INSURED.**

Plaintiff advises that her date last insured was December 31, 2007.  The ALJ erred in failing to take in account any earnings after 2006.

Date last insured is based on the claimant's work history and the number of work credits they have accumulated in the last five out of ten years.  *McCracken v. Commissioner of Social Security,* 2009 WL 2983049, *7, fn. 3 (S. D. Ohio 2009).  The date last insured is basically an expiration date for social security disability benefits.  *Id.*  To be approved for benefits, one is required to prove that the disability began before the date last insured expired.  *Id.*  When a date last insured lapses, or passes, a disability claimant, from that point forward, is no longer in the position of being able to win social security disability benefits based on their current disability status.  *Id.*

The Magistrate finds that there was no reason for the ALJ to reconfigure her date last insured to include earnings after 2006.  SSA had already considered her earnings through 2007 in determining that her insured state expired on December 31, 2007 (Tr. 88-94).

### X. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court reverse the Commissioner's

20

decision and remand the case to the Commissioner to (1) reconsider Plaintiff's residual functional capacity by making an appropriate determination of Plaintiff's residual functional capacity assessment, examining Section III and considering it under the rules; (2) consider whether Plaintiff is able to perform sustained work activity on a regular and continuous basis consistent with SSR 96-8p; and (3) reassess whether Plaintiff is disabled and/or entitled to a period of disability based on the new determinations and the record as a whole.  The Magistrate also recommends that the Court terminate the referral to the undersigned Magistrate.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   June 22, 2011


## XI. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.